UNITED STATES BANKRUPTCY COURT
SOUTHEN DISTRICT OF FLORIDA
West Palm Beach Division

IN RE:

    JEFFREY MARC SISKIND,                Case No. 13-13096-PGH

        Debtor.                                      Chapter 11
_____/

JEFFREY MARC SISKIND,

        Plaintiff,

v.                                                    Adv. No. _____

STEVEN S. NEWBURGH
c/o McLaughlin & Stern LLP
525 Okeechobee Boulevard, Ste. 1700
West Palm Beach, FL  33401,

and

MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY  10016,

and

ROBERT A. GIBSON
1709 22nd Avenue North
Lake Worth FL  33460,

        Defendants.
_____/

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR TORTIOUS INTERFERENCE AND TO ENFORCE THE PERMANENT POST-CONFIRMATION INJUNCTION IN CASE NO. 13-13096**

      COMES NOW the Debtor, Jeffrey Marc Siskind, by and through counsel, and moves for

injunctive relief and damages against Robert A. Gibson ("Gibson"), whose address is 1709 22nd

Avenue, Lake Worth, Florida 33460, and over whom the Court has jurisdiction due to first entering this case by his recent filing of an objection to the administrative closure of this case, but who knew about this case from the date Debtor filed its petition, and Steven S. Newburgh whose address is c/o McLaughlin & Stern LLP, 525 Okeechobee Boulevard, Ste. 1700, West Palm Beach, FL 33401, and McLaughlin & Stern, LLP, whose address is 260 Madison Avenue New York, NY 10016, with whom Gibson is acting in concert, which equitable relief is necessary on an emergency basis to prevent Gibson's continued willful and malicious interference with Debtor's business, which willful and malicious interference is violation of the permanent post-confirmation injunction which exists in this case by virtue of Debtor's confirmed Chapter 11 Plan, and states:

1. On or about December 31, 2016, Debtor informed Gibson, who provided paralegal and receptionist services to Debtor through his Florida d/b/a, Intelexigent Unlimited, that he would no longer require Gibson's services on an exclusive basis, but that Debtor would continue to engage Gibson's services on an as needed basis, as opposed to continuing to pay Gibson at the rate of $1,250 per week.

2. Debtor and Gibson agreed that Gibson, who had worked with other attorneys and understood Debtor's need to protect its clients, would continue to maintain the confidentiality of Debtor's clients' information and refrain from interfering with Debtor's continued representation of said clients, which Gibson had threatened to do if he were ever terminated by Debtor.

3. During the period that Gibson provided services to Debtor, his duties included assisting with client case management, research, and drafting and revising pleadings and other papers. Gibson was also responsible for filing all case documents, retainer/engagement and payment records, including the safekeeping thereof.

4. The need to curtail Gibson's involvement in case management resulted in part from Debtor's discovery of Gibson's surreptitious activities, which included soliciting several of Debtor's clients to obtain an interest in their respective causes of action, which he promoted in exchange for managing the advancement of their litigation.

5. In a case involving Florida Atlantic University and the Hibel Art Foundation, Gibson convinced members of the Foundation's Board of Trustees to appoint him as a Co-Trustee while working on behalf of Debtor's law firm, although Gibson had no experience whatsoever in the art world.

6. In other cases, Gibson devised a method to induce prospective clients to permit him to effectively join as a Co-Plaintiff by 'selling' his ability to manage their litigation, and attempted to 'sell' the prospect of financial returns to Debtor if Debtor would provide legal representation on a hybrid or contingency fee basis.

7. Gibson continued this practice of buying into causes of action despite Debtor repeatedly informing him that this activity was infected with a conflict of interest due to his work on behalf of Debtor and warned that it may also constitute practicing law without a license.

8. Gibson also engineered these co-party relationships with firm clients, including Judy Hildago-Smith and David Babich (deceased), where filings with the Florida Secretary of State indicate that he was appointed by Debtor's clients to director and officer positions, respectively, and also in a matter pertaining to an elderly client, Thelma Adelman, with whom Debtor has been prevented contact by Gibson.

9. In each of the instances in which Gibson came to own a part of the litigation, Debtor was not informed at all of Gibson's involvement until after Debtor began the representation.

10. Most recently, Gibson contacted Debtor's client Debora Patzer ("Patzer"), whose four foreclosure-related cases were all but concluded, except for the release of remaining surplus sale funds from which Debtor was to be paid in full for more than three years of legal work accomplished on Patzer's behalf (Debtor first appeared for Patzer appeared on February 2, 2015 in case no. 2011CA016765, on August 27, 20125 in case no. 2011CA018942, and in two subsequent appeals).

11. Prior to the release of funds to pay Debtor's legal fees, for reasons unknown to Debtor but through Gibson's furtive efforts, Patzer contacted attorney James Merola, who first reportedly questioned Patzer's departure from Debtor and told her that Debtor had filed the appropriate motion to enable the release of those funds.

12. Nevertheless, Merola attempted to obtain Debtor's consent to substitute in for Debtor in the case affecting the disposition of the funds and also lobbied Debtor to release said funds in full to Merola's trust account, stating first as a reason therefore only that there existed some undefined dispute between Patzer and Debtor, and later only that Patzer was displeased with the outcome of her cases.

13. Importantly, Patzer never disputed the time being spent by Debtor on her matters and, although she was repeatedly warned that time spent on her cases and in prosecuting two separate appeals could result in Debtor being due all, if not a significant portion, of the remaining surplus funds which she would otherwise be entitled to receive.

14. Instead, Patzer authorized Debtor to press on in an effort to lay the groundwork for a subsequent unlawful ejectment action against a third-party purchaser who had already received two separate awards against her for rent and legal fees.

15. This third-party purchaser filed the only objection to the release of remaining surplus funds but later agreed to an order enabling the release of said funds, which was properly obtained absent a timely filing by Merola who had not entered the case.

19. Recognizing that Debtor's negotiations with the only objecting party resulted in an Agreed Order which permitted Debtor to realize its long-awaited payment for work performed on behalf of Patzer only after issuance of the distribution order in State court, Merola first noticed his appearance in the Patzer case and then moved on an emergency basis to impede the release and distribution of the Patzer funds.

17. Merola's emergency motion was granted ex parte despite the lack of a sufficient basis therefore and absent any articulation of a claimed "dispute" between Debtor and Patzer.

18. Notwithstanding, prior to issuance of the order granting Merola's emergency motion, Debtor received payment in full for all work which Debtor performed on behalf of Patzer.

19. While Gibson urged Patzer to terminate Debtor's representation prior to Debtor receiving payment of its fees, Gibson also refused to respond to Debtor's request for the telephone numbers of Debtor's numerous clients, including Patzer and John Snow, on whose behalf Debtor filed an ejectment action.

20. Gibson's refusal required Debtor to travel to defendant's location in an effort to obtain his own client's telephone number from the defendant in that matter.

21. During an in-person conversation with said defendant, Joseph Karam, at his premises on Friday, February 26, 2018, Karam informed Debtor that Gibson planned to meet with him the next day to "resolve" the litigation with Debtor's client.

22. Because Debtor believed that Gibson, a licensed private investigator but not an attorney, had arranged to unlawfully practice law purportedly on behalf of Debtor, Debtor advised Gibson via email that he should refrain from conducting said meeting because he would be doing so without Debtor's authorization, especially in light of his refusal to inform Debtor of his actions in this and other legal representation matters belonging to Debtor.

23. Debtor lacks knowledge as to whether the arranged meeting between Gibson and the defendant, pertaining to John Snow v. Joseph Karam, et al., Palm Beach County Case No. 502018CC001229XXXXMB, ever occurred.

24. Gibson's theft of Debtor's property is only one aspect of his continuing willful and malicious activities intended to damage Debtor.

25. In addition to this and his other mentioned activities, Gibson has attempted to mount sufficient claims against Debtor in an effort to prevent the administrative closure of Debtor's case, and in doing so has made numerous statements and has acted as an attorney.

26. Gibson recently made false representations to several of Debtor's clients and business associates, including George Maler ("Maler"), with whom Debtor and Debtor's father have done business for years, in an effort to enroll objectors to Debtor's administrative closure of its Chapter 11 case.

27. Gibson contacted Maler numerous times in an effort to have Maler join him and remit the sum of $5,000 to fund Gibson's efforts, and those of Steven Newburgh ("Newburgh") who would act as counsel for Gibson and others. While 'pitching' Maler, Gibson falsely stated the he had already enrolled creditors who had already refused Gibson and Newburgh's efforts to enlist their participation.

28. Maler's experience was typical of the experience of other prospective litigants which were first identified by Gibson, and with whom Newburgh followed up by explaining how a recovery could be obtained by converting Debtor's case to one proceeding under Chapter 7 after Gibson made initial contact(s).

29. Upon information and belief, one such prospective litigant is Richard Fairchild, an individual who was represented by Debtor. Debtor believes that Gibson convinced Fairchild that he held a potential claim against Debtor, and that Gibson could 'buy in' to Fairchaild's purported cause of action, although Fairchild is not a creditor in Debtor's case.

30. Gibson is thusly upon information and belief continuing to acquire prospective causes of action and act as an unlicensed attorney while working for and purportedly being represented by Newburgh.

31. Gibson's fraudulent activities are violations of Debtor's permanent post-confirmation injunction, which the U.S. Supreme Court found to be similar to violations of 11 U.S.C. § 362 and warrant the imposition of severe sanctions.

32. His activities, including his joinder as an objector to administrative closure, are intended to harm Debtor by preventing Debtor from conducting the practice of law which is Debtor's means of supporting himself and his family, and paying creditors.

33. Additionally, Gibson is fully aware that Debtor does not owe Gibson any money and is not a creditor herein, except if Gibson somehow acquired a legitimate creditor's claim, and that any claim made by Gibson, whose actions are demonstrably in retribution for Debtor's gradual termination of Gibson's services for cause, is in bad faith and is a patently false claim under 11 U.S.C. §152(4), and for which Debtor may obtain damages.

34. In violation of 11 U.S.C. § 362, Gibson, who knew about Debtor's Chapter 11 case since the date on which the petition was filed, is willfully and maliciously tortuously interfering with the operation of Debtor's business, a law practice, which is Debtor's chief means of financial support, by unlawfully withholding all of Debtor's client and business files and secreting information which is needed by Debtor to represent its clients by;

(1) preventing Debtor's access to Debtor's electronically stored files,

(2) refusing to provide Debtor with clients' contact information, and

(3) actively soliciting Debtor's clients to terminate Debtor and move to other law firms.

35. Gibson's activities, which are in violation of the post-confirmation permanent injunction, are immediately damaging the estate and, if not immediately prevented, will continue to diminish the estate by thwarting Debtor's ability to pay its creditors.

36. Debtor requests the following equitable relief in addition to damages which the Court deems appropriate:

a. A temporary restraining order which prevents Defendants from continuing to engage in actions which damage Debtor, absent which protection Debtor will suffer immediate and irreparable damage, based upon an affidavit which demonstrates that irreparable injury to Debtor will result if a temporary restraining order is not issued, to which Debtor will attach email correspondence which Debtor sent to Defendant(s) to resolve the matter without the need to litigate.

b. A temporary injunction which extends the relief obtained by the temporary restraining order, after an evidentiary hearing.

c. A permanent injunction which mirrors the relief obtained under the temporary injunction.

WHEREFORE, Debtor requests that this Court enjoin Defendants from tortuously interfering with the operation of Debtor's law practice by issuing a temporary restraining order, temporary and permanent injunctive relief, prohibiting Defendants from violating the permanent post-confirmation injunction, and for such other and further relief as appropriate under the circumstances.

**S I S K I N D  L E G A L**

*/s/ Jeffrey M. Siskind*
Jeffrey M. Siskind, Esquire
FBN 138746
3465 Santa Barbara Drive
Wellington, FL  33414
TEL  (561) 791-9565
FAX   (561) 791-9581
Email: jeffsiskind@msn.com